# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 16-1387V**
**Filed: November 7, 2018**
PUBLISHED

JODI COOPER,

Petitioner,

v.

SECRETARY OF HEALTH AND HUMAN SERVICES,

Respondent.

Special Processing Unit (SPU); Decision on Damages; Damages Hearing; Hepatitis A (Hep A) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA)

*Leah VaSahnja Durant, Law Offices of Leah V. Durant, PLLC, Washington, DC, for petitioner.*
*Amy Paula Kokot, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION AWARDING DAMAGES[1]

**Dorsey**, Chief Special Master:

On October 24, 2016, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of her October 30, 2015 Hepatitis A ("Hep A") vaccination. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters. On January 18, 2018, a ruling was issued finding petitioner entitled to compensation for her SIRVA. (ECF No. 33.) For the reasons described below, the undersigned now awards compensation in the amount of $113,642.33.

[1] The undersigned intends to post this decision on the United States Court of Federal Claims' website. **This means the decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access. Because this unpublished decision contains a reasoned explanation for the action in this case, undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I. Procedural History

On November 4, 2016, petitioner filed medical records marked as Exhibits 1-9 along with an affidavit marked as Exhibit 10. (ECF No. 7.) Following an initial status conference, additional records were ordered, which were filed as Exhibits 11 and 12 on January 17, 2017. (ECF Nos. 9, 10.)

Initially, the parties engaged in settlement discussions. (ECF No 15.) However, on August 7, 2017, petitioner's counsel advised the undersigned that the parties had reached an impasse. (ECF No. 24.) During a status conference held August 23, 2017, the parties reported that "they have evaluated and valued the case differently and that the most significant issue is respondent's view regarding the period of time from vaccination until petitioner sought treatment of her injury." (ECF No. 25.) The parties further agreed that the record was complete, with the exception of a potential fact hearing. (*Id*.)

Subsequently, the parties agreed to proceed to a ruling on the written record in lieu of a fact hearing and a further status conference was held to establish a briefing schedule. (ECF No. 28.) The parties agreed that petitioner would file a motion for a finding of fact accompanied by any outstanding supplemental evidence petitioner wished to have considered, followed by a combined Rule 4 Report and motion response by respondent, and a reply brief by petitioner. (*Id*.)

Petitioner filed her motion on October 23, 2017, and did not include any accompanying supplemental evidence. (ECF No. 29.) Respondent filed his combined Rule 4 report and motion response on January 2, 2018, and petitioner's reply was filed on January 17, 2018. (ECF Nos. 31, 32.)

On January 18, 2018, the undersigned issued a finding of fact with regard to the onset of petitioner's shoulder pain and a ruling on entitlement finding petitioner entitled to compensation for a SIRVA. (ECF No. 33.) The parties subsequently attempted to resume their negotiations in light of the undersigned's ruling; however, petitioner reported that the parties were "just too far apart" to resolve the case informally and requested a damages hearing. (ECF No. 35.)

In preparation for the damages hearing, the parties filed pre-hearing briefs (ECF Nos. 40, 42) and petitioner filed additional medical records marked as Exhibits 13-14, and 19. (ECF Nos. 43-44.) Respondent objected to petitioner's discussion in her pre-hearing brief of the medical facts of other cases without the express written consent of the individual whose medical facts were being discussed. A status conference was held before the undersigned to resolve the issue on July 12, 2018. The undersigned noted that she is concerned both with the requirements of Vaccine Act section 12(d)(4)(A) and with the individual's rights pursuant to HIPAA. The undersigned found that remedial action was not necessary since petitioner's brief is not a public document, but noted that

she would not consider or cite inappropriately disclosed material in reaching her decision in this case.[3] (ECF No. 45.)

Additionally, several witness statements were filed prior to the hearing as Exhibit 15.[4] (ECF No. 43.) Documentation of unreimbursable expenses was filed and marked as Exhibits 16, 17, and 20. (ECF Nos. 43-4, 43-5, 47-1.)

A damages hearing was held in Portland, Maine, on July 19, 2018. (*See* Transcript of Proceedings ("Tr.") at ECF No. 50.) Petitioner, Jodi Cooper, her husband, Paul Moniz, and her former coworker, Sheila Rollins, testified. (*Id*.)

Following the hearing, petitioner filed additional documentation of her expenses as Exhibits 21 and 23 and a statement by her message therapist recommending future care as Exhibit 22. (ECF Nos. 51, 54.) On September 19, 2018, petitioner confirmed that the case is ripe for a decision by the undersigned. (ECF No. 55.)

## II. Medical History

On October 30, 2015, petitioner received a Hepatitis A vaccination from her primary care physician which was administered in her left deltoid. (Ex. 1, p. 1; Ex. 2, p.

---

[3] In prior decisions, the undersigned has considered and discussed proffered amounts from prior cases as "a frame of reference" when deciding SIRVA damages in the absence of available reasoned decisions. *See, e.g. Desrosiers v. HHS,* No. 16-224V, 2017 WL 5507804, at *5 (Fed. Cl. Spec. Mstr. Sept. 19, 2017). However, the undersigned has discouraged the practice and given very little weight to such citations even in the absence of any objection. In *Kim v. HHS*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018), the undersigned explained that

> [W]hile the undersigned appreciates the rationale behind citing selected prior proffered awards, the usefulness of these citations without more is minimal. This approach has several significant limitations and becomes less persuasive as additional reasoned decisions become available. First . . . awards based on stipulations and proffers may include additional elements of damages, such as lost wages or medical expenses, that are not clearly communicated by the negotiating parties. Moreover, notwithstanding the representations made in the party briefs regarding the merits of these prior cases, the facts of these individual cases are not a part of the record of this case nor are they disclosed in the cited decisions. Third, the scale of the . . . history of prior SPU SIRVA awards (864 such awards in four years) is such that petitioner's [individual] citations, even assuming arguendo that they are very well matched to the facts of the instant case, necessarily represent "cherry picking."

Indeed, petitioner has raised a similar or related point in her brief, arguing that reliance on prior negotiated resolutions by other firms is problematic because her counsel has achieved better results in similarly situated cases than those cited by the petitioner in *Desrosiers*. (ECF No. 42, p. 17.) Petitioner also stresses that informal resolutions may be artificially low due to the fact that they likely represent comprise amounts from petitioner's perspective. (*Id*.)

[4] In addition to the testifying witnesses, Cathie Door, a friend of petitioner, and Matthew Whitman, the assistant general manager at petitioner's place of employment, provided statements. (Ex. 15, pp. 3, 7.)

1.) Petitioner explained that she received the vaccination in preparation for a month long trip to Vietnam beginning November 24, 2015. (Ex. 10, pp. 1-2; Tr. 18-19.)

At the time of her vaccination, petitioner was 51 years old. (Ex. 2, p. 1.) Her prior medical history included prior reports of back pain (*e.g.* Ex. 5, p. 1), headaches (*e.g.* Ex. 5, pp. 4-5), joint pain (*e.g*. Ex. 12, p. 7), and right shoulder pain (*e.g*. Ex. 12, p. 3).[5] More than two years prior to the vaccination at issue in this case, on July 8, 2013, petitioner presented to her chiropractor with a two day history of left shoulder pain radiating down the left arm and into the little finger. (Ex. 5, p. 4.) Petitioner did not relate her shoulder pain to any trauma. (*Id*.) Her chiropractor suggested the pain could be related to her ongoing neck and back problems and performed a full spine adjustment and recommended cryotherapy. (*Id*.) Three days later, petitioner returned to her chiropractor on July 11, 2013, and reported that the shoulder pain had resolved. (*Id*.) Additionally, petitioner reported in her affidavit that she previously slipped and fell on the deck of her boat in August of 2015, but indicated that she did not suffer any injury as a result. (Ex. 10, p. 2.)

Petitioner testified that her October 30, 2015 Hep A injection was "excruciating." (Ex. 10, pp. 1-2; Tr. 19.) She described aching for three weeks following the vaccination and indicated that she performed massage and minor stretching. (*Id*.) Petitioner represented that she was very busy during this period, preparing for her upcoming trip to Vietnam and making care arrangements for her 91-year-old mother, a dementia patient living in a nursing home. (Ex. 10, pp. 1-2; Tr. 20-21, 86.) Petitioner indicated that she prioritized these concerns over her own care. (*Id*.) Petitioner testified that she was experiencing steady pain during this period, but that her shoulder had not yet started "freezing." (Tr. 21.)

Petitioner further explained that from November 25, 2015, until December 21, 2015, she and her husband were in Vietnam. (Ex. 10, p. 2; Tr. 22.) Petitioner recalled that she had difficulty dressing while she was on her trip and that she had several massages during her trip for pain relief. (*Id*.) Petitioner testified that her shoulder began to freeze while she was on this trip. (Tr. 22.) She recalled her pain as being an eight and ten on a scale of one to ten during the trip.[6] (*Id*.)

Upon her return from Vietnam, petitioner reports that she was informed on December 23, 2015, that her mother had fallen and was acting strangely. Petitioner

---

[5] Petitioner's right shoulder pain began as a sudden pain while exercising (push-ups) in July of 2012. It was diagnosed as a rotator cuff strain. (Ex. 12, p. 3.)

[6] Petitioner testified that her shoulder remained frozen for six to nine months. (Tr. 32.) This would be until about June to September of 2016. Petitioner testified that during this time her pain was at a ten most of the time. (*Id*.) She further testified that during this period she could not ski, snowshoe, or even pull a broom toward her, and that her condition impacted her sleeping. (Tr. 33-34.) Driving was also more difficult. (Tr. 35.) Petitioner testified, however, that the range of motion did not come back after the six to nine months. (Tr. 43-44.)

further explained that her mother was placed in hospice care and died on December 29, 2015. (*Id*.) Petitioner made all the arrangements for transport and cremation. (*Id*.)

Thereafter, petitioner first sought medical treatment for her shoulder pain on January 6, 2016. (Ex. 3, p. 47; Ex. 10, p. 3.) According to her physician's notes, petitioner "complains of left shoulder pain" that "has been present for the last 1-2 months occurring with reaching or extending. She denies any injury, trauma, swelling, bruising, or pain at rest."[7] (Ex. 3, p. 47.) Petitioner also described "near identical" prior episodes of frozen shoulder. The physician noted that in 2012 she had been diagnosed with right shoulder tendinitis.[8] (*Id*.) Upon physical examination, petitioner's shoulder was "tender to palpation over supraspinatus," but impingement tests ("Hawkins") were negative and range of motion was normal for flexion, extension, and rotation. (Ex. 3, p. 48.) X-rays were negative. (*Id*.) Petitioner was diagnosed as having rotator cuff tendinitis. Avoidance of lifting or repetitive motion, ice, over-the-counter pain relievers, and physical therapy were recommended. (*Id*.) Orthopedic follow up or steroid injection were noted as additional steps if the condition persisted. (*Id*.)

Subsequently, petitioner underwent a physical therapy evaluation on January 19, 2016. (Ex. 3, p. 2.) Petitioner rated her pain as a ten at worse, four at best, and a seven at the time of her evaluation.[9] The pain was characterized as "sharp." (Ex. 3, p. 2.) Active range of motion was recorded as within normal limits for flexion and 110 degrees for abduction. Passive range of motion was 160 degrees flexion and 120 degrees abduction with painful end feel. (*Id*.) She reportedly treated previously with ice, heat, arnica, and TENS.[10] (*Id*.) Hawkins/Kennedy testing for impingement was positive and petitioner was assessed as having impingement and tendinitis. (Ex. 3, p. 3.) Decreased scapular strength and stability were also noted. (*Id*.) Petitioner reported that her pain is worse with reaching back and twisting. (*Id*. at 2.) Petitioner's physical therapy plan

---

[7] Petitioner also complained of palpitations which she reported were not a new symptom, having been occurring for "a few years." (Ex. 3, p. 47.)

[8] This record does not specifically identify the shoulder implicated in the near identical prior episodes of frozen shoulder, but does seem to suggest in the later notation that this refers to petitioner's 2012 right shoulder tendinitis diagnosis. (Ex. 3, p. 47.) Petitioner's earlier shoulder complaints are recorded at Ex. 5, p. 4 (left shoulder, 2013) and Ex. 12, p. 3 (right shoulder, 2012).

[9] During the hearing petitioner stressed the evaluation form she filled out in connection with this appointment. (Tr. 38 (discussing Ex. 3, p. 39).) This document further breaks down petitioner's pain and difficulty for different tasks based on the same ten point scale. (Ex. 3, p. 39.) With regard to difficulty, petitioner rated washing her back as a ten (meaning so difficult it requires help) and putting on a shirt as a nine. (*Id*.) She rated washing her hair and placing an object on a high shelf as eights. (*Id*.) With regard to pain, petitioner indicated that her pain is a ten at worst, but with regard to specific functions her highest ratings were marked as an eight. (*Id*.) She marked reaching for something on a high shelf and touching the back of her neck as the two most painful activities. Additionally, the form includes a written comment stating that "Reaching say – over the back seat of the car is the worst. Can't buckle bra." (*Id*.)

[10] TENS is an acronym for transcutaneous electrical nerve stimulation. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32nd Ed.), p. 1882.

included 1-2 visits per week for six weeks. (*Id*. at 3.) Her level of disability was characterized as 57%, but her rehab potential was noted to be "good." (*Id*. at 2, 4.)

Petitioner returned for physical therapy on January 22 and 27, 2016, with no change in her symptoms. (Ex. 3, pp. 5-9.) On February 1, 2016, she reported that her shoulder continues to be painful (*Id*. at 10), but by February 4, 2016, she reported that "her shoulder continues to be painful with certain motions, but notes that it does feel more stable" (*Id*. at 12).

During that same period, petitioner also saw her chiropractor and an acupuncturist. On February 8, 2016, petitioner presented to her chiropractor with "increased pain in both sides of the cervicothoracic area" as well as increased neck pain potentially due to her shoulder exercises. (Ex. 5, p. 22.) The chiropractor believed that "there may be a connection in the lack of improvement in her shoulder with PT and her upper back and neck issues."[11] (*Id*.) Petitioner saw her acupuncturist for her ongoing left shoulder pain on February 10, 2016. (Ex. 4, pp. 1-5.) The acupuncturist's notes indicate that petitioner's left shoulder pain "started after getting 2nd Hep A shot in upper arm Oct. 2015. Pain and stiffness increased over next 2-3 mos." (*Id*. at 5.) The acupuncturist subsequently noted that the shoulder pain was waking petitioner in the night. (*Id*. at 7.) A notation by the acupuncturist dated February 19, 2016, states that "rotation of arm/shoulder leads to excruciating pain." (Ex. 4, p. 7; Tr. 39.)

On February 23, 2016, petitioner's physical therapist noted that after eight sessions, petitioner's shoulder pain was increasing while her range of motion decreased. (Ex. 3, p. 21.) An orthopedic consultation was recommended. (*Id*.) Petitioner reported to her physical therapist that "her pain is worse now than when she started therapy. It is throughout her shoulder girdle and down to her elbow. It hurts with all motions, especially behind her back."[12] (Ex. 3, p. 22.) Petitioner had six more physical therapy sessions in February and March without any improvement before being seen by an orthopedist. (*Id*. at 23-29.)

On March 11, 2016, petitioner was evaluated by an orthopedist. (Ex. 7, p. 1.) The history taken by the orthopedist stated that petitioner:

> has been having left shoulder restricted mobility and problems since she had a hepatitis A vaccine for travel back on October 30, 2015. She said when the shot was administered, it was very painful for several days afterwards, and then she began to have increasing pain in the shoulder to the point where it gradually became worse where she had difficulty moving the shoulder. She now has a lot of trouble staying asleep because of the

[11] Petitioner returned for continued treatment the next day. (Ex. 5, p. 24.)

[12] Petitioner testified that she attributed her increased pain to the freezing process and not to the physical therapy itself. (Tr. 42.)

> discomfort in the shoulder. She has tried Advil. She has done physical therapy and continues with physical therapy, but none of this has really helped her condition. She is most frustrated by the restricted mobility of the shoulder in addition to the nighttime pain. Other than this injection, she has had no prior injury to the shoulder. Pain is described as deep in the shoulder, sometimes radiating to the upper arm. She has not noted distal grip weakness. There has been no numbness, paresthesias, tingling, or neck pain.

(Ex. 7, p. 1.)

On physical examination, the orthopedist found no visible swelling or atrophy of the shoulder but noted slight palpatory pain over the anterolateral subacromial bursa. "Global limitations" were noted in range of motion, including having only 80 degrees of forward flexion, 70 degrees of abduction, and 20 degrees of external rotation. (Ex. 7, p. 2.) Impingement signs were noted to be difficult to assess, but increased pain was noted on the Hawkins test. (*Id.*) Additionally, the orthopedist confirmed that petitioner's prior January 6, 2015 x-rays were negative and additionally ordered diagnostic ultrasound, which was also negative for any shoulder abnormalities. (*Id*.) The orthopedist's diagnostic impression was that "Jodi's symptoms appear consistent with left adhesive capsulitis. I suspect given her history, this may have been aggravated initially by the injection into the subacromial bursa with her hepatitis vaccine that may have triggered this." (Ex. 7, p. 2.) The orthopedist recommended that petitioner consider a corticosteroid injection into the bursa, but also cautioned that recovery would take time, indicating that patience and a gentle exercise routine were necessary. (*Id*.)

In the several months following her orthopedic evaluation, petitioner had further appointments with her chiropractor[13] (Ex. 9), a massage therapist (Ex. 6), and physical therapist (Ex. 3).[14] From March 28 to April 1, 2016, petitioner's physical therapy notes indicate improvements in range of motion. (Ex. 3, pp. 32-36.) On April 1, 2016, petitioner reported that "she had a massage yesterday and her shoulder is feeling pretty good today. She has been sleeping better over the past two days."[15] (*Id*. at 36.)

---

[13] During the hearing petitioner stressed notations from a March 15, 2016 chiropractic visit which indicate (under "Ortho – Supraspinatus test performed") that she reported "increased pain in the shoulder joint that was severe on the left. Pain or weakness is significant for supraspinatus tendinitis." (Tr. 40-41 (referring to Ex. 9, p. 20.)

[14] Petitioner testified that she tried the acupuncturist, chiropractor, and massage therapist both because "I wanted to cover everything" and because "I would rather do things naturally, and felt like it was non-invasive." (Tr. 52.) Petitioner indicated that she has been a believer in chiropractic treatment since she was young. (*Id*.) Asked by her counsel if acupuncture and massage therapy were effective for her, petitioner responded "Yes. Somewhat . . . it helps with anxiety as well, which I was having a lot of." (Tr. 52-53.)

[15] Petitioner testified that massage therapy "helped not only to loosen things up a little bit, but it also helped with my anxiety. It relaxed me a little bit. It would last for several days after a massage therapy appointment. So that helped a lot mentally." (Tr. 52.)

Petitioner discontinued her physical therapy on May 2, 2016, after 18 sessions in favor of continuing to work with her massage therapist. (Ex. 3, p. 38.) Her last physical therapy assessment indicated "passive shoulder flexion 130, abduction 100 degrees. More tenderness with cupping in bicep and tricep region. The patient was able to tolerate increased flexion and abduction after cupping and mobs." (*Id*. at 36.)

During this period, she also established care with a new primary care physician on March 21, 2016. (Ex. 8, p. 7.) Her intake history included "frozen shoulder on left since last October." (*Id*.) Petitioner declined a second orthopedic evaluation. (Ex. 8, p. 8.) On April 20, 2016, petitioner returned to her primary care physician. (Ex. 8, p. 3.) At that time it was noted that petitioner had ended her physical therapy sessions, but that she still had "quite limited" range of motion. (*Id*.)

On June 24, 2016, petitioner reported to her chiropractor that she was experiencing "constant sharp and shooting discomfort in the left tricep." (Ex. 9, p. 1.) She rated her pain as being a ten out of ten, but indicated that discomfort decreased with chiropractic care, medication, heat and ice. (*Id*.) Range of motion was noted to be "severely reduced with pain noted." (*Id*. at 2.) Based on her failure to progress in physical therapy, the chiropractor opined that "it is reasonable to believe that her recovery may take longer than an average patient with an uncomplicated case," though he did expect "good progress" and a "recovery with few residuals." (*Id*.)

A year later, on June 12, 2017, petitioner returned to physical therapy by self-referral.[16] (Ex. 13, pp. 45-53.) She reported that "since having frozen shoulder she has not gotten her ROM back. She continues to do her HEP of stretching and strengthening at home 3x/week. She also has chiropractic twice a month." (*Id*. at 45.) She rated her

---

[16] Petitioner's physical therapy occurred during three periods. She first attended from January to May of 2016 as previously described. (Ex. 3.) She resumed physical therapy in June of 2017 and continued through July. (Ex. 13, p. 34-46.) She then waited two months before returning again and attending sessions from September to November of 2017. (Ex. 13, pp. 1-33.) With regard to her physical therapy, petitioner testified that:

> [t]here was some breaks in between where I felt like it had come to a place where they had given me so many exercises that I could, you know, try – they had me doing them at home anyway. I bought lots of different pieces of equipment that they supplied, that I could buy from them at the physical therapist. And I used them at home . . . So there was times when I just – I needed a break from going to physical therapy appointments, and so I would do my stuff at home; and it was what they were doing there with me anyway . . . Then I went back when things didn't seem to be getting better. They did other things at physical therapy. They did cupping. They did laser treatments. They did iontophoresis."

(Tr. 45.) Petitioner described the laser therapy as being "electrical muscle stimulation" like TENS. (Tr. 46.) She described iontophoresis as including both electrical stimulation and topical medication. (*Id*.)

pain as seven at worst, one at best, and five at the time of her evaluation.[17] (*Id*.) The physical therapists assessment indicated that "Ms. Cooper presents with continuing pain and ROM limitations of her left shoulder. The adhesive capsulitis is resolved however her signs and symptoms suggest RTC impingement and tendinitis. She will benefit from physical therapy to manage her pain and address impairments in ROM, strength and stability so she may return to full function with her left upper extremity." (*Id*. at 46.) Her degree of disability was characterized as 53%. (*Id*. at 45.)

Petitioner attended eight physical therapy sessions from June 12, 2017, to July 31, 2017, with some improvement noted. (Ex. 13, pp. 34-53.) She was reevaluated on September 25, 2017, after a two month hiatus.[18] (*Id*. at 33.) At that time she noted her pain to be eight at worst, one at best, and three at the time of evaluation.[19] (*Id*.) The physical therapists assessment was that petitioner "does demonstrate some GH laxity and decreased scapular stability and RTC strength. This is leading to impingement and RTC tendinitis." (*Id*.) Petitioner reported that she "has referred herself back for PT after taking a couple months off. She continues to have difficulty and pain reaching overhead or in front. She has painful snapping and she feels pain deep in the joint. She does note that the pain has not been keeping her awake at night." (*Id*. at 30.) Her shoulder disability was rated at 51%. (*Id*.) She attended nine physical therapy sessions between September 25, 2017, and November 27, 2017, with little improvement reported. (*Id*. at 1-33.)

On December 18, 2017, petitioner returned for a further orthopedic evaluation. (Ex. 19.) The orthopedist noted petitioner's long history of physical therapy[20] with

---

[17] Active range of motion was recorded as 150 degrees flexion and 110 degrees abduction. Passive range of motion was recorded at 160 degrees flexion and 125 degrees abduction with painful end feel. (Ex. 13, p. 45.)

[18] Petitioner characterized this return as a "last-ditch attempt" to find additional exercises or treatments that would help her pain and range of motion issues. (Tr. 48.) During the hearing, petitioner stressed that her physical therapy goals at this time still related to basic functions such as reaching overhead or behind her back, specifically, petitioner's goals included donning a pullover shirt and unhooking her bra without pain. (Tr. 48-49.) Petitioner described the modified manner in which she accomplishes these things. (*Id*.) Petitioner also stressed the pain scale she filled out at the time of the September 24, 2017 evaluation as well. (Tr. 50-51 (referencing Ex. 13, p. 25.).) Petitioner indicated at the time of the hearing that she would fill out the form much the same way if she were to do it again, but also noting that she had recently aggravated her shoulder while boating. (Tr. 51.)

[19] Active range of motion was 145 degrees flexion, 115 degrees abduction and passive range of motion was 160 degrees flexion and 120 degrees abduction with painful end feel. (Ex 13, p. 30.)

[20] Petitioner provided a history of having "undergone 50 sessions" of physical therapy. (Ex. 19, p. 1.) Petitioner also testified that she attended over 50 physical therapy sessions. (Tr. 45.) It is not clear to the undersigned what petitioner is referring to by 50 sessions. Upon the undersigned's review of the Continuum Physical Therapy records filed in this case, petitioner attended 35 physical therapy sessions. (Ex. 3, 13.) She attended 18 sessions between January and May of 2016 (Ex. 3), eight sessions in June and July of 2017 (Ex. 13, pp. 34-46), and nine sessions between September and November 2017 (Ex. 13, pp. 1-33).

"moderate" improvements in pain and range of motion. (*Id*. at 1.) Petitioner denied having any pain at rest, but complained of restricted motion and described pain at the end point of motion. (*Id*.) On physical exam the orthopedist noted active range of motion of approximately 160 degrees forward flexion and 150 degrees abduction, with 70 degrees of external rotation and internal rotation to the lower thoracic spine. (*Id*. at 2.) He noted passive range of motion to be "mildly restricted." (*Id*.) The orthopedist concluded:

> A long discussion was had with the patient today regarding the diagnosis, prognosis, and treatment plan. We discussed the complexity of her situation given the chronicity of her symptoms. I suspect she had a chronic adhesive capsulitis with mildly restricted range of motion and mild persistent pain. We discussed at length both the conservative and surgical treatment options. In terms of conservative management, I would recommend a fluoroscopically guided glenohumeral steroid injection. Post injection, I stressed the importance of aggressive physical therapy working on passive and active range of motion exercises. With regard to surgical intervention, given the chronicity of her symptoms I cannot guarantee 100% full recovery. If the patient elects to entertain surgical intervention, I would recommend an MRI for further evaluation. Patient would like to consider her options moving forward. She will follow-up on an as-needed basis. Jodi understands the treatment plan and all questions were answered.

(Ex. 19, p. 2.)

Petitioner testified that she rejected the orthopedist's recommendation for a corticosteroid injection, because she was afraid of needles due to her injury being caused by her vaccination injection. (Tr. 54.) She also recalled that the orthopedist told her there is "a really good chance" surgery would not improve her condition. (*Id*.) Petitioner indicated that her doctor told her that she might have reached maximal improvement ("that this might be it and "that I might have to live with what I have"), but she testified that he did not tell her how likely he felt that outcome was. (Tr. 55.)

Petitioner subsequently returned to her chiropractor several times. (Ex. 14, pp. 1-14.) The most recent record filed in this case is from a June 12, 2018 chiropractic visit. (Ex. 14, pp. 1-2.) That record indicates that, among other complaints, petitioner "complained of frequent dull and tightness discomfort in the left trapezius. She rated the intensity of the discomfort, using a VAS, as a level 4 on a scale of 1 to 10 with 10 being the most severe. The discomfort was reported to increase with applied pressure. The discomfort was reported to decrease with chiropractic care." (Ex. 14, p. 1.) Examination showed "shoulder ROM left was recorded as within normal range but with pain at end of motion." (*Id*. at 2.) The chiropractor felt that petitioner's prognosis was "improving" and that she "is expected to demonstrate improved function" due to her good response to chiropractic care. (*Id*.) Petitioner testified that she has her chiropractor check her

shoulder routinely. (Tr.56.) She also testified that she continues to do the home exercises she learned in physical therapy and yoga[21]. (Tr. 64.)

As of the time of the hearing in this case (July 19, 2018), petitioner reported that she had pain of about a five or six on a ten point scale. (Tr. 23.) She described the pain as "fluctuating," depending on how much she uses her arm. (Tr. 23-24.) She testified that she experiences pain of about a five at rest, but up to about an eight when she is engaged in physical activity. (Tr. 24-25.) Petitioner described her biggest challenge as reaching overhead and also described other challenges with reaching motions. (Tr. 28, 44.) Petitioner also demonstrated her range of motion. (Tr. 91-93 .) The undersigned observed that petitioner's pain began at about 145 degrees abducted as well as with flexion and extension. (Tr. 92-93.) Petitioner could reach around her back almost as high as her bra strap. (Tr. 93.)

## III. Impact on Personal Life

Petitioner testified that she and her husband are very active people. (Tr. 16.) She explained that they enjoy a lot of outdoor activities such as hiking, snowshoeing, downhill skiing and cross-country skiing and that her injury has interfered with these activities. (*Id*.) She also noted that it interferes with travel and backpacking.[22] (Tr. 58-60.) Petitioner stressed, in particular, that she and her husband met on the basis of their shared interest in sailing. (Tr. 17.) They had planned to do extensive sailing after he retired. (*Id*.) She noted that they had been planning his early retirement for a long time and that he has given his notice to retire in December of 2019, but now she does not know if she will be able to fully participate given her injury. (*Id*.) Their retirement plan involved coastal sailing out beyond the bay of Maine, but due to her injury she has been afraid to sail beyond Penobscot Bay.[23] (Tr. 27-28.)

Petitioner explained the physical demands required of sailing, including pulling lines, working sails, cranking sails, pulling anchor, and even operating the tiller. (Tr. 25-26.) She explained that these tasks involve overhead reaching and the use of both arms. (*Id*.) Petitioner indicated that these tasks are not impossible for her now, but that they are difficult and she has had to make modifications. (Tr. 26.) She characterized the

---

[21] Petitioner also testified briefly to occasional informal treatments from a friend who is a hand therapist and her sister-in-law who is a massage therapist. (Tr. 61-62.) The timing of these treatments was not indicated.

[22] Petitioner's husband also described snorkeling, swimming, spelunking, diving, climbing, and bicycling as shared activities. (Tr. 101.)

[23] Petitioner testified that she has never sailed in the open ocean. (Tr. 88.) She is unsure if they ever will sail out beyond the bay, because the waves and weather are different. (*Id*.) Petitioner's husband characterized the "retirement" more as a seven year or so hiatus from work which they planned to do while still able bodied enough to sail. (Tr. 111-12.) He stressed their desire to sail down to the Caribbean, but noted that petitioner cannot fully enjoy swimming because she cannot pull herself back up on the boat. (*Id*.)

resulting circumstance as "not ideal." (*Id*.) As a result of her limitations, petitioner testified that they had a "short" and "modified" sailing season in the year preceding the hearing. (Tr. 26-27.) Petitioner's husband similarly explained that petitioner's limitation may force modifications to their broader sailing plans, such as requiring the hiring of a deck hand, in order to sail safely. (Tr. 103-05.) He also indicated that he and petitioner would modify their roles on board so that she would do more piloting and he could take on more physical tasks. (*Id*.) He further indicated that they would have to sell their current boat and buy a boat with different equipment that petitioner could better handle for safe sailing. (Tr. 111, 114.)

One particular task petitioner explained she can no longer do is called "belaying." (Tr. 26.) In sailing, belaying refers to hauling someone up on a rope line to the top of the mast. (*Id*.) Petitioner explained that her husband goes to the top of the mast for repair work and that she has historically belayed him while he is working, but since her injury she can no longer do so. (*Id*.) Petitioner's husband testified that as a result of petitioner's injury he has had to find other people to help him. (Tr. 102.)

Petitioner also described the impact her injury has had on her working life. (Tr. 30-31.) Petitioner previously worked on a seasonal basis as a caterer and waitress, most recently in the Mount Abram ski resort area. (Tr. 16, 30.) Petitioner explained, however, that when she returned from Vietnam she was unable to waitress, because she couldn't carry any trays. (Tr. 30.) Petitioner declined a position at Mount Abram as a hostess and took a lower paid position as a cashier at Good Tern Co-op. (Tr. 30-31.) However, even this position included some activities that were difficult for petitioner, such as lifting and sweeping. (Tr. 29.) Ultimately, however, she was able to switch positions to "supplement buyer," which is a higher paying position.[24]

Additionally, Sheila Rollins testified that she and petitioner worked together in catering for about ten years. (Tr. 81.) She testified that she observed petitioner most recently at a catering event about one month prior to the hearing in this case. (Tr. 75.) She testified that she noticed petitioner's difficulty with range of motion in her arm and stressed the degree to which catering requires lifting and carrying. (Tr. 75-77.) She also recalled petitioner's pain from May of 2016. (Tr. 81-82.) Ms. Rollins indicated that petitioner's limitations impacted her effectiveness at work. (Ex. 15, p. 6; Tr. 77-78.)

Petitioner also testified that her injury has been a strain on her marriage. (Tr. 60-61.) Petitioner's husband similarly testified that the pain and stress of the situation impacted their intimacy and domestic life, including petitioner's ability to participate in home remodeling projects and daily chores such as making up the bed or taking laundry off the drying line. (Tr. 108-10.)

[24] Petitioner is not asserting any claim for lost wages. (Tr. 31.)

## IV. Party Contentions

In addition to compensation for her past unreimbursed medical expenses, petitioner seeks an award of compensation for her pain and suffering of between $175,000.00 and $200,000.00.[25] (ECF No. 42, p. 1.) In requesting such an award, petitioner stresses in her pre-hearing brief[26] the long (three year) duration of her injury as well as the fact that her most recent medical records show ongoing pain and reduced range of motion. (*Id*. at 11.) In that regard, she stresses that the record shows that she "tried every possible treatment modality." (*Id*. at 12.) Based on the failure of these treatments and the duration of her condition to this time, petitioner argues that she "must now accept that her condition will not improve."[27] (*Id*.) She also stresses that her testimony and medical records demonstrate that for the first year of her injury her pain was "excruciating." (*Id*. at 11.) She further notes that the injury has had an impact on her personal life, including hindering her activities of daily living as well as impacting her employment and her sailing. (*Id*. at 11-12.) She argues that these issues, and the resulting anxiety, leave her "acutely" aware of her injury. (*Id*. at 12.) In sum, petitioner contends that the record evidence shows that "she still suffers from a nasty SIRVA." (*Id*. at 13.) Petitioner states that she "acknowledges that [while] she is not as debilitated as she was during the first year of her injury, significant residua remain and they continue to haunt her life daily." (*Id*.)

In his prehearing brief, respondent proposed an award for petitioner's pain and suffering of $45,000.00. (ECF No. 40, p. 1.) Respondent stressed that the medical records do not support petitioner's claim of immediate, severe pain that continues to date. (*Id*. at 6.) Respondent argued that the records reflect active treatment of only about five and a half months, from January 6, 2016, to June 24, 2016. (*Id*.) Respondent contended that "petitioner's records are marked by the *absence* of significant pain, disability, and medical treatment. Namely, she did not undergo surgery

---

[25] Petitioner proposes that SIRVA claims should be categorized based on severity and duration as "rough guidelines" for awarding compensation. (ECF No. 42, p. 20-21.) Specifically, petitioner asserts that appropriate awards for pain and suffering would be as follows:

| | |
|---|---|
| Injuries lasting six months: | $100,000 - $125,000 |
| Injuries from six months to one year: | $125,000 - $160,000 |
| Injuries lasting one year to two: | $160,000 - $190,000 |
| Permanent residua (non-debilitating): | $175,000 - $250,000 |
| Permanent residua (debilitating): | over $250,000 (reduced by cap to $250,000) |

(ECF No. 42, p. 22.) The undersigned notes that, as described below, these proposed awards are significantly higher than what has *typically* been awarded in SIRVA cases. *See Kim, infra*.

[26] Petitioner's counsel also offered an opening statement at the beginning of the hearing. (Tr. 6-15.) The opening statement addressed the same reasoning as included in petitioner's pre-hearing brief, but provided further elaboration on the aspects of the evidentiary record petitioner wishes to stress. (*Id*.)

[27] Based on life expectancy, petitioner argues she will suffer her current condition for 30 years. (ECF No. 42, p. 13.)

or other procedures; she did not require prescription medication; she did not seek ongoing treatment for impaired range of motion or loss of strength; and she did not have any cortisone injections." (*Id*. (emphasis original).) Respondent concluded that petitioner's contemporaneous medical records "demonstrate that her clinical course did not necessitate immediate or ongoing treatment." (*Id*. at 7.) Subsequently, however, in light of later-filed records and the evidence elicited at the damages hearing, respondent revised his recommendation to $92,500.00. (ECF No. 52.) Respondent has no objection to certain of petitioner's claimed expenses as filed at Exhibit 17 totaling $1,060.59. (*Id*.) However, respondent agrees only to $1,908.46 of the expenses included within Exhibit 16. (*Id*. at 2.)

## V. Discussion

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. HHS*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life. *Shapiro v. HHS*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")

### a. Pain and suffering

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. HHS,* No. 04- 1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. HHS*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[28] *I.D.*, 2013 WL

---

[28] In this case, awareness of the injury is not in dispute. The record reflects that at all relevant times petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, the undersigned's analysis will focus principally on the severity and duration of petitioner's injury.

2448125, at *9; *McAllister v. HHS,* No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995).

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *Jane Doe 34 v. HHS*, 87 Fed. Cl. 758, 768 (2009)(finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.") And, of course, the undersigned also may rely on her own experience adjudicating similar claims.[29] *See Hodges v. HHS*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *Graves v. HHS*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 595.

In that regard, the undersigned notes that over the past four years the Special Processing Unit has amassed a significant history regarding damages in SIRVA cases. In *Kim v. HHS*, the undersigned explained that after four years of SPU experience, 864 SIRVA cases were resolved informally as of July 1, 2018. 2018 WL 3991022, at *6. The undersigned noted that the median award for cases resolved via government proffer is $100,000.00 and the median award for cases resolved via stipulation by the parties is $71,355.26.[30] *Id*. In *Kim*, the undersigned rejected petitioner's citation to a few isolated

[29] From July 2014 until September 2015 the SPU was overseen by former Chief Special Master Vowell. Since that time, all SPU cases, including the majority of SIRVA claims, have remained on the undersigned's docket.

[30] The undersigned further stressed that the "typical" range of SIRVA awards – meaning the middle quartiles – is $77,500.00 to $125,000.00 for proffered cases and $50,000.00 to $95,228.00 for stipulated cases. The total range for all informally resolved SIRVA claims – by proffer or stipulation – spans from $5,000.00 to $1,500,000.00. 2018 WL 3991022 at *6. Importantly, these amounts represent total compensation and typically do not separately list amounts intended to compensate for lost wages or expenses. *Id*. The undersigned noted that "[t]hese figures represent four years' worth of *past* informal resolution of SIRVA claims and represent the bulk of prior SIRVA experience in the Vaccine Program. However, these figures are subject to change as additional cases resolve and do not dictate the result in this or any future case. Nor do they dictate the amount of any future proffer or settlement." *Id*.

proffers and noted that "to the extent prior informal resolutions are to be considered, the undersigned finds that the overall history of informal resolution in SPU provides a more valuable context for assessing the damages in this case. Since it reflects a substantial history of resolutions among many different cases with many different counsel, the undersigned is persuaded that the full SPU history of settlement and proffer conveys a better sense of the overall arms-length evaluation of the monetary value of pain and suffering in a typical SIRVA case."[31] *Id*. at *9.

Additionally, since the inception of SPU in July 2014, there have been several reasoned decisions by the undersigned awarding damages in SPU SIRVA cases where the parties were unable to informally resolve damages. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering. To date, these decisions are[32]: *Desrosiers v. HHS*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); *Dhanoa v. HHS*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.14 in past unreimbursable medical expenses); *Marino v. HHS*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); *Knauss v. HHS*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); *Collado v.HHS*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); *Kim v. HHS*, No. 17-418V, 2018 WL 3991022 (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 for medical expenses); *Dobbins*, No. 16-854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for pain and suffering and $3,143.80 for medical expenses).

In their respective briefs, the parties compared the instant case to *Desrosier*, *Dhanoa*, and *Marino*.[33] Additionally, petitioner cited two decisions issued by other

---

[31] Petitioner cited the following informal resolutions: *Deak v. HHS*, No. 14-668V ($160,000.00); *Jenny v. HHS*, No. 14-338V ($140,000.00); *Brand v HHS*, No. 12-549 ($178,225.98); and *Strobel v. HHS*, No. 15-1375V ($184,750.00). Additionally, petitioner sought to distinguish the informal resolutions in *Curtis v. HHS*, No. 16-85V ($91,217.75) and *Ponsness*, No. 15-826V ($95,000.00). Respondent cited informal resolutions in *Crefasi v. HHS*, No. 15-166V ($50,000.00); *Varblow v. HHS*, No. 15-931V ($35,000.00); *Burkart v. HHS*, No. 14-581V ($35,000.00); *Grant v. HHS*, 13-743V ($35,785.00); and *Hamilton v HHS*, No. 15-701V ($50,000.00).

[32] This list is limited to those decisions which have been made public at the time of issue of this decision.

[33] The briefs in this case were filed on July 5, 2018. Although the *Knauss* and *Collado* decisions cited above were issued before the briefs were filed, they were not made publicly available until after the parties had filed their briefs. *Kim* and *Dobbins* were decided after the briefs had been submitted.

special masters in prior SIRVA cases.[34] In *Anthony v. HHS*, petitioner was awarded $248,540.00 for pain and suffering. No. 14-680V, 2016 WL 1169147 (Fed. Cl. Spec. Mstr. Mar. 2, 2016).[35] In *Courbois* v. HHS, petitioner was awarded $142,794.40 for pain and suffering. No. 13-939V, 2016 WL 2765092 (Fed Cl. Spec. Mstr. Apr. 20, 2016).[36]

The undersigned is mindful of all of the above; however, in determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. Upon the undersigned's review of the complete record in this case and in consideration of the undersigned's experience evaluating SIRVA claims, the undersigned finds that an award of $110,000.00 is appropriate in this case.

The undersigned finds that petitioner experienced approximately eight months of severe or significant pain following her SIRVA followed by a longer period of residual pain and reduced range of motion. This is based on petitioner's testimony as well as on the course of her treatment. Petitioner testified that her worst period of pain lasted for between six to nine months. (Tr. 32.) However, after eight months of treatment, beginning on June 24, 2016, petitioner began a one year hiatus from physical therapy before returning on June 27, 2017. (Ex. 9, p.1; Ex. 13, pp. 45-53.)

As described above, there is also significant evidence of further residua following this eight-month period, involving both pain and restricted range of motion. Notwithstanding the gaps in her physical therapy, petitioner remained in physical therapy through November of 2017, more than two years following her injurious vaccination. (Ex. 13, pp. 1-33.) The physical therapy records document ongoing difficulties with both pain and range of motion. Moreover, her orthopedist remarked on the chronicity of petitioner's condition in December of 2017. (Ex. 19, p. 2.) Further, petitioner demonstrated her range of motion during the hearing. (Tr. 91-93.) The undersigned finds that petitioner continued to experience residual pain and reduced range of motion through the date of the hearing in this case, approximately two years and nine months following petitioner's injurious vaccination.

---

[34] Petitioner also cited several intussusception cases; however, in the undersigned's view, such cases are not sufficiently analogous to be instructive.

[35] The decision issued in the *Anthony* case did not address the factors that contributed to the special master's award. The special master had previously ruled from the bench following a damages hearing. Of note, although the facts are not disclosed, the award in *Anthony* also included a significant award for future life care expenses, suggesting a level of disability far beyond what the instant petitioner experienced and far beyond the typical SIRVA. In the undersigned's experience, it is highly unusual that a SIRVA would warrant an award for future life care.

[36] Like *Anthony*, the special master in *Courbois* had made a prior oral ruling and the factors contributing to the special master's award were not disclosed.

Additionally, the undersigned has considered the extent to which petitioner's injury has impacted her personal life. In particular, petitioner has credibly explained how her injury has demonstrably impacted her active lifestyle. Most notably, petitioner's condition has interfered, at least temporarily, with her ability to sail with her husband, an activity which both she and her husband testified is central to their marriage and lifestyle.

The undersigned's award is also tempered, however, by competing evidence with regard to the severity of petitioner's pain. On one hand, petitioner testified credibly that her condition was very painful. Additionally, the contemporaneous records include notations which identify high levels of pain and disability. (*See, e.g.* Ex. 3, p. 2, 39.) On the other hand, petitioner did not seek any formal medical treatment for her condition until January 6, 2016.[37] (Ex. 3, p. 47; Ex. 10, p. 3.) She did not seek orthopedic care until March 11, 2016. (Ex. 7, p. 1.) Once she began active treatment, she discontinued physical therapy for a full year. Diagnostic studies (ultrasound) were negative for abnormalities (Ex. 7, p. 2) and petitioner never underwent any surgery or had any MRI imaging performed. Despite the duration of her residua, petitioner had only two orthopedic consultations. Each time, she opted for more conservative treatment and declined a corticosteroid injection for pain relief. (Ex. 7, p. 2; Ex. 19, p. 2; Tr. 54.)

Moreover, the undersigned does not find preponderant evidence to support an award of future pain and suffering. Notwithstanding petitioner's testimony that she fears her condition is irresolvable, petitioner made progress throughout her active treatment. At her last orthopedic consultation, her pain and range of motion were deemed to be only "mild." (Ex. 19, p. 2.) And although petitioner testified that the orthopedist suggested she *might* have reached maximal improvement, she also testified that he did not express any opinion regarding how likely that outcome would be. (Tr. 55.) Petitioner's more recent chiropractic records reflect range of motion "within normal range but with pain at the end of motion." (Ex. 14, p. 2.) According to petitioner's chiropractor, petitioner's prognosis is "improving" and further improved function was expected. (*Id*.) In December of 2017, petitioner was released from orthopedic care to return on an "as needed" basis.[38] (Ex. 19, p. 2.) Thus, there are no medical records and no medical expert evidence to support petitioner's claim for an award for projected pain and suffering. As noted above, petitioner bears the burden of proof with respect to each

---

[37] Notwithstanding that petitioner explained that her trip to Vietnam and her subsequent care for her mother in her final days caused her delay in seeking treatment, the fact of the delay remains a relevant consideration regarding the severity of petitioner's condition. *See, e.g. Marino*, 2018 WL 2224736, at *8 (noting that "the fact that Ms. Marino delayed seeking treatment is relevant to the value of her claim, but does not defeat her claim.")

[38] Petitioner filed a letter from her massage therapist stating that "I recommend Message Therapy once per week for the indefinite future as part of Jodi Cooper's continued care for her shoulder. We have seen great benefit in her receiving regular massage." (Ex. 22.) The undersigned does not find that this letter provides significant weight supporting any award for either future pain and suffering or future medical expenses.

element of compensation requested and medical records are the most reliable evidence of petitioner's condition. *Brewer*, 1996 WL 147722, at *22-23; *Shapiro*, 101 Fed. Cl. at 537-38.

Thus, in light of all of the above, the undersigned finds that $110,000.00 represents an appropriate award for petitioner's actual or past pain and suffering.

**b. Unreimbursable Expenses**

Initially, petitioner filed documentation for unreimbursed medical expenses as Exhibits 16 and 17. (ECF No. 43.) Exhibit 16 was identified as out-of-pocket expenses submitted[39] June 5, 2017, and included costs totaling $3,583.54. (ECF No. 43-4.) Exhibit 17 was identified as out-of-pocket expenses submitted July 5, 2018, and included costs totaling $1,060.59. (ECF No. 43-5.) Respondent indicated that he had no objection to the $1,060.59 of expenses contained in petitioner's Exhibit 17, but that he did not feel the expenses claimed in Exhibit 16 were sufficiently documented. (ECF No. 46.) Subsequently, petitioner filed as Exhibit 20 additional documentation in support of the expenses listed in Exhibit 16 (ECF No. 47); however, there remained confusion regarding whether the expenses reflected in the two exhibits (Exhibits 16 and 20) matched perfectly (ECF No. 52). Nonetheless, respondent agreed that Exhibit 16 reflected $1,908.46 in compensable expenses. (ECF No. 52.)

Several points were discussed regarding petitioner's expenses during the hearing. (Tr. 66-69, 90-91, 94-98.) Following the hearing, petitioner refiled her expense documentation as Exhibit 21, titled as "Combined Out of Pocket Expenses."[40] (ECF No. 51.) In Exhibit 21, petitioner indicates that she has a total of $4,208.81 in expenses, including only a reduced amount of $2,902.65 in expenses submitted June 5, 2017, the same $1,060.59 in expenses submitted July 5, 2018, $158.37 for "Intermed PA" submitted on July 18, 2018, and $87.20 for mileage to travel to the damages hearing on July 19, 2018. (Ex. 21, p. 1.) Subsequently, petitioner filed a further charge from Ainslee Pine-Massage Therapist of $96.00 for services on September 17, 2018. (Ex. 23.)

---

[39] "Submitted" presumably refers to the parties' prior settlement discussions. Petitioner provided a demand for settlement to respondent on June 5, 2017. (ECF No. 18.)

[40] During the hearing, petitioner's counsel had represented that Exhibit 21 would be a cover sheet to accompany the documentation included in Exhibit 20. However, petitioner's Exhibit 21 represents a refined list of the expenses previously identified as "submitted June 5, 2017," with supporting documentation, a refiling of the expenses previously identified as "submitted July 5, 2018," and some further expenses. (Ex. 21.) The list of expenses included in Exhibit 21 exactly matches the documentation included in that exhibit, but does not match the list of expenses included in Exhibit 16. Accordingly, the undersigned concludes that the list of expenses at Exhibit 21 supersedes the previously filed Exhibits 16 and 17.

Respondent has indicated that he has no objection to expenses from Continuum Physical Therapy,[41] Bay Chiropractic Rockland, Eileen Murray Acupuncture, Bethel Station Chiropractor, and OA Centers for Orthopedics. (ECF No. 52, p. 2.) Respondent objects to expenses from Jensen's Pharmacy, Good Tern Nature Co-op (supplements), Intermed PA, Synergy Massage; Frozen Shoulder Exercises Website, and Ainslee Pine-Massage Therapist. (*Id*.) Respondent contends that these expenses either were not "reasonably necessary" or lacked supporting documentation. (*Id*.) Respondent also disputes the $87.20 in mileage claimed as that is better characterized as a litigation expense. (*Id*. at 3.)

The undersigned has reviewed petitioner's expenses and supporting documentation as filed at Exhibit 21. Upon the undersigned's review, petitioner has documented $1,647.25 in expenses incurred at Continuum Physical Therapy, $124.39 at Bay Chiropractic Rockland, $216.75 at Eileen Murray Acupuncture, $94.32 at Bethel Station Chiropractor, and $372.31 at OA Centers for Orthopedics. In total, this amounts to $2,455.02 of expenses which are not disputed by respondent.

Additionally, the undersigned has considered petitioner's testimony regarding the effectiveness of her massage therapy as well as her testimony explaining that her purchases from the Good Tern Co-op, which were labeled as "supplements," were actually topical pain relievers for muscle as well as oral supplements for joint health recommended by her acupuncturist.[42] (Tr. 52-53, 65-66, 91.) Accordingly, the undersigned concludes that petitioner's expenses from the Good Tern Nature Co-op, Synergy Massage, and Ainslee Pine – Massage Therapist were reasonably necessary in light of petitioner's testimony placing these modalities in the context of her overall treatment plan and preferences. However, the undersigned does find that the charge of $300.00 incurred on April 11, 2016, from Ainslee Pine – Massage Therapist is inconsistent with and substantially more than the remaining charges from that provider and the substantially increased amount is not adequately explained. Accordingly, the undersigned does not find that charge to be sufficiently documented. Thus, upon the undersigned's review of petitioner's Exhibit 21 and 23, the undersigned finds that petitioner has documented reasonable expenses from these providers in the amount of $1,122.08. This includes $376.00 from Synergy Massage, $532.00 from Ainslee Pine – Massage Therapist, and $214.08 from Good Tern Nature Co-op.

The undersigned also finds that petitioner's expense of $5.99 related to obtaining access to a home exercise website for frozen shoulder was reasonable. Additionally, the undersigned finds that petitioner's documentation supports only a claim of $59.23 for charges related to petitioner's January 6, 2016 visit to Intermed. The remainder of

---

[41] Respondent did indicate that he objects to one charge from Continuum Physical Therapy (dated September 19, 2016) as undocumented; however, that charge appeared only in petitioner's Exhibit 16 and was subsequently removed when petitioner refiled her expenses as Exhibit 21.

[42] Significantly, respondent does not object to the expenses related to the acupuncture treatment itself.

the charges related to that provider appear to be unrelated to petitioner's shoulder condition.

The undersigned has reviewed all of petitioner's submitted documents and concludes, for all the reasons described above, that petitioner is entitled to compensation for unreimbursable expenses in the amount of **$3,642.33**.[43] The undersigned is not persuaded by the remainder of petitioner's expense claims.[44]

## VI. Conclusion

In light of all of the above, and in consideration of the record as a whole, the undersigned finds that petitioner should be awarded $110,000.00 in compensation for actual (or past) pain and suffering and $3,642.33 in compensation for past unreimbursable expenses. The undersigned makes no award for projected pain and suffering, future medical expenses, or past or future lost wages.

Accordingly, **the undersigned awards petitioner a lump sum payment of $113,642.33, representing $110,000.00 in compensation for actual pain and suffering and $3,642.33 in compensation for past unreimbursable expenses, in the form of a check payable to petitioner, Jodi Cooper. This amount represents compensation for all damages that would be available under § 300aa-15(a).**

The clerk of the court is directed to enter judgment in accordance with this decision.[45]

---

[43] As explained above, this amount includes the following:

| | |
|---:|---|
| $1,647.25 | Continuum Physical Therapy |
| $124.39 | Bay Chiropractic Rockland |
| $216.75 | Eileen Murray Acupuncture |
| $94.32 | Bethel Station Chiropractic |
| $372.31 | OA Center for Orthopedics |
| $376.00 | Synergy Massage |
| $532.00 | Ainslee Pine – Massage Therapist |
| $214.09 | Good Tern Nature Co-op |
| $5.99 | Frozen Shoulder Exercise Website |
| $59.23 | Intermed |
| $3,642.33 | Total |

[44] The undersigned agrees with respondent that petitioner's mileage reimbursement is better addressed as a litigation expense to be submitted with petitioner's application for attorneys' fees and costs.

[45] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Chief Special Master